OPINION OF THE COURT
Stuart C. Cohen, J.
In this proceeding, petitioner Greek Orthodox Archdiocese of North and South America (the Archdiocese) seeks, inter alia, an order declaring the validity of a 1987 order issued by the Supreme Court, Westchester County, which approved the sale of certain real property owned by the Archdiocese. The Archdiocese also challenges the constitutionality of certain statutes pursuant to which the Attorney-General of the State of New York contends that the Archdiocese’s actions require further governmental review and approval.
The Archdiocese was incorporated in 1921 under the Religious Corporations Law. It is a church recognized by the Apostolic Historic Eastern Orthodox Patriarchate of Constantinople, as referred to under section 290 of the Religious Corporations Law. The Greek Orthodox Church is the worldwide body of communicants of the Greek Orthodox faith. The Archdiocese states that it is the highest spiritual and governing authority of the church for all communicants of the Greek Orthodox faith in North and South America.
On or about November 24, 1980, the Archdiocese purchased approximately 29 acres of partially improved real property in Purchase, Town of Harrison, Westchester County. On or about September 26, 1983, the Archdiocese purchased approximately 22 acres of unimproved property adjacent to the first parcel. These 51 acres of land were known collectively as the "Lincoln Rise Property.”
In 1986, the Archdiocese decided to sell the Lincoln Rise Property. Proposals were received from several parties as to possible purchase, but these proposals were determined to be *853 insufficient. In late 1986, Chris Demetriades, the director of economic development of the Archdiocese, made a proposal on behalf of his corporation, Demetriades Developers, Inc. (DDI), to purchase the property for approximately $10,000,000. On or about February 13, 1987, the executive committee of the Archdiocesan Council unanimously passed resolutions approving the proposed sale to DDI.
Paragraphs 6 and 44 of the contract of sale expressly conditioned the agreement’s enforceability on court approval thereof as required by section 12 of the Religious Corporations Law. On or about March 23, 1987, the Archdiocese commenced a proceeding in Supreme Court, Westchester County, entitled Matter of Greek Orthodox Archdiocese of N. & S. Am. (index No. 5874/87). The Attorney-General was not given notice of this proceeding. Nevertheless, on April 3, 1987, an order was entered granting permission to the Archdiocese to sell the Lincoln Rise Property to DDL The order provided that the Archdiocese was authorized "to do all such necessary things, and to sign, acknowledge and deliver any and all documents as may be deemed appropriate and required in connection therewith” and "that the consideration received by the [Archdiocese] will be for corporate purposes.” On March 18, 1987, the Archdiocese and DDI held a closing of the sale of Lincoln Rise Property. DDI gave the Archdiocese, among other things, cash in the amount of $4,692,500, a subordinated note and mortgage in the principal amount of $5,307,500 and a note in the amount of $4,347,606.
Subsequent to obtaining court approval of the conveyance, the Archdiocese agreed to modify its contract of sale with DDI at two different times. In the summer of 1990, the Archdiocese received letters from DDI describing its financial difficulties and requesting that modifications be made to the contract of sale. After considering DDI’s request, the Archdiocese agreed to restructure the contingent interest formula contained in the agreement.
In September 1991, DDI requested a second modification. DDI submitted a letter from its certified public accountants, representing that DDI had incurred approximately $10 million of additional costs and expenses due to the Lincoln Rise Project. DDI proposed a 2^-year restructuring of the debt arguing that if it was not granted such relief, it would seek the protection of the bankruptcy laws. In January 1992, the Archdiocese agreed to accept a one-time cash payment of *854 $1,303,275 from DDI in return for releasing DDI from any further obligations under the contract.
The Archdiocese neither sought nor obtained court approval for either of these modifications. In August 1992, Simos Di-mas, a member of the Archdiocese, commenced a CPLR article 78 proceeding against the Archdiocese and DDI alleging, among other things, that the Archdiocese had not properly obtained court approval for the conveyance of the Lincoln Rise Property to DDI or for any of the modifications to the contract of sale. The Attorney-General also alleged, inter alla, that the Archdiocese was required to obtain court approval for the modifications. As a means of resolving these conflicting claims, the Archdiocese commenced this proceeding.
In the petition, the Archdiocese seeks an order declaring that the 1987 order of the Supreme Court, Westchester County, approving the sale to DDI was valid and that subsequent modification to the contract did not require further court approval. In the alternative, the Archdiocese contends that section 12 (1) of the Religious Corporations Law is unconstitutional. The Attorney-General interposed an answer which includes a counterclaim alleging that the modifications to the contract were consummated in violation of the law and requiring the Archdiocese to seek nunc pro tune approval of the modifications.
Presently before the court are motions for summary judgment by the Archdiocese and DDI which seek judgment for the relief demanded in the petition. The Attorney-General opposes these motions and moves for leave to conduct discovery.
The Archdiocese first seeks a declaration that Religious Corporations Law § 12 (1), the statute mandating court approval of the sale, does not apply to a church’s sale of real property which is not used as a place of worship and, therefore, does not apply to the Archdiocese’s sale of the Lincoln Rise Property.
Religious Corporations Law § 12 (1) provides, in relevant part: "A religious corporation shall not sell, mortgage or lease for a term exceeding five years any of its real property without applying for and obtaining leave of the court therefor pursuant to section five hundred eleven of the not-for-profit corporation law” (emphasis added).
The language of this provision is clear and unambiguous. By using the words "any of its real property” the Legislature did *855 not intend to limit applicability of the statute to property used as a place of worship.
Where a statute describes the particular situations in which it is to apply and no qualifying exception is added, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded (Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662). Had the Legislature intended to limit the applicability of Religious Corporations Law § 12 (1), as the Archdiocese contends, it could have done so easily through appropriately worded legislation (see, Eaton v New York City Conciliation & Appeals Bd., 56 NY2d 340).
Furthermore, the court cannot consider any legislative history which contradicts the clear and unambiguous language of the statute. Where, as here, a statute is clear, a court should not attempt to cure an omission in the statute by supplying what it believes should have been put there by the Legislature. Regardless of the contents of any memorandum written by a drafter of legislation, the legislation stands for what its words manifest and not the inner thoughts of the draftsman (Matter of Daniel C., 99 AD2d 35, 41, affd 63 NY2d 927).
Accordingly, it is declared that Religious Corporations Law § 12 (1) applies to the sale, mortgage or lease of any real property by a religious corporation, not merely to property used as a place of worship, and the statute therefore applies to the Archdiocese’s sale of the Lincoln Rise Property.
The Archdiocese next seeks a declaration that Religious Corporations Law § 12 (1) does not apply to a church’s decision to adjust or modify financial instruments, so that the 1990 and 1992 modifications of promissory notes and mortgages did not require governmental review or approval pursuant to the Religious Corporations Law.
The Archdiocese argues that Religious Corporations Law § 12 requires court approval only for a conveyance of real property, not for modifications of a promissory note which do not affect title to the real property. The Attorney-General argues that modifications of the amount received for the property relates directly to the factors considered by the court in approving the sale and, therefore, court approval of the modifications was required.
By its terms, Religious Corporations Law § 12 (1) applies when a religious corporation shall "sell, mortgage or lease for a term exceeding five years any of its real property.”
*856 Although the statute contains no express language making it applicable to modifications of any agreement, pursuant to New York contract law, a modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of the agreement intact (Beacon Term. Corp. v Chemprene, Inc., 75 AD2d 350). Accordingly, by entering into agreements to modify the price to be paid on the original contract, the Archdiocese and DDI entered into a new contract of sale which, pursuant to Religious Corporations Law § 12 (1), had to be approved by the court. It is, therefore, declared that the 1990 and 1992 modifications did require court approval pursuant to the Religious Corporations Law and that the Archdiocese is required to obtain nunc pro tune approval of said modifications (see, Religious Corporations Law § 12 [9]).
The request for a declaration that the April 3, 1987 order of the Westchester County Supreme Court is binding and effective is granted without opposition. The Attorney-General does not question the validity of the 1987 order. The foregoing declarations resolve DDI’s motion for summary judgment.
The Archdiocese also argues that provisions of the Religious Corporations Law are unconstitutional.
The Archdiocese argues that Religious Corporations Law §§ 12 and 2-b (1) (d-1) — which provide that certain churches are required to notify the Attorney-General when obtaining leave of court to sell, mortgage or lease real property, while other churches are not required to notify the Attorney-General — discriminate between religious denominations and religious corporations, are an intrusion into and entanglement with the internal affairs of the Archdiocese in violation of the Establishment Clause and interfere with the Archdiocese’s internal procedure for administering itself in violation of the Free Exercise Clause.
In Lemon v Kurtzman (403 US 602, 612-613 [1971]) the United States Supreme Court articulated a three-part test for evaluating the constitutionality of government actions under the Establishment Clause. First, the statute must have a secular legislative purpose. Second, its principal or primary effect must be one that neither advances nor inhibits religion. Finally, the statute must not foster an excessive government entanglement with religion.
The purpose of requiring notice to the Attorney-General of *857 the sale of real property by a religious corporation is to insure that such sale is in the best interest of the corporation and its members and that the proceeds are properly disbursed. This provision was a result of "several instances of questionable practices resulting in lawsuits to enjoin and set aside transfers of religious property within congregational-type religious churches.” (NY Dept of Law, Mem to Governor, Bill Jacket, L 1981, ch 244.) The purpose of enacting this provision — to protect the interests of members of religious corporations by safeguarding potentially substantial proceeds from sales of property — is secular and there is no evidence to suggest that the statute was motivated by an intent to endorse or disapprove religion.
Additionally, the principal and primary effect of the notice provision neither advances nor inhibits religion. The notice provision does nothing to convey any message whatsoever that could be construed to advance or inhibit any religion or religious belief. This notice requirement does not even remotely involve any indoctrination of particular religious views by the State nor does it convey any message of State support, or inhibition of religion.
Furthermore, the notice requirement does not foster an excessive government entanglement with religion. Routine regulatory interaction, such as the notice requirement, which involves no inquiries into religious doctrine, no delegation of State power to a religious body and no detailed monitoring and close administrative contact between secular and religious bodies, does not violate the nonentanglement command (Hernandez v Commissioner, 490 US 680, 696-697 [1989]).
Accordingly, the provision requiring notice to the Attorney-General passes constitutional muster pursuant to the Lemon test.
To show a free exercise violation, the religious adherent has the obligation to prove that a governmental regulatory mechanism burdens the adherent’s practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which faith mandates (Hobble v Unemployment Appeals Commn. of Fla., 480 US 136 [1987]).
The provisions in the Religious Corporations Law requiring notice to the Attorney-General when a religious corporation seeks leave of court to sell, mortgage or lease real property have no effect on, and therefore place no burden on, *858 the members of the Archdiocese to practice their religion— either by pressuring them to commit some act forbidden by their religion or by preventing them from engaging in conduct mandated by their faith. Any inquiry by the Attorney-General involves only the terms of a real estate transaction; it involves no inquiry into religious beliefs nor does it involve the regulation or prohibition of conduct undertaken for religious reasons.
The Archdiocese’s claim that the Religious Corporations Law discriminates among churches presents a more difficult issue.
Pursuant to Religious Corporations Law §§ 2-b and 12, certain religious corporations, which are hierarchically structured, such as the Roman Catholic Church, Protestant Episcopal Church, Ruthenian Catholic Church of the Greek Rite, African Methodist Episcopal Zion Church, Presbyterian Church and United Methodist Church, are not required to give notice to the Attorney-General when making an application for the sale, lease or mortgage of real property. However, the statutes also provide that before any of these exempted churches may sell, mortgage or lease real property, they must obtain approval by their top executive before submission to the court. For example, the Roman Catholic Church must obtain the consent of the "archbishop or bishop of the diocese” (Religious Corporations Law § 12 [3]) while the Protestant Episcopal Church must obtain the consent of the "bishop and standing committee of the diocese” (Religious Corporations Law § 12 [2]).
In a memorandum for the Governor, dated June 8, 1981, the Attorney-General explained the exemption for hierarchical churches as follows: "This exception is based on the theory that there are safeguards already built into the process under section 12 of the Religious Corporations Law for hierarchical churches by requiring approval of the sale by the top executive of the hierarchical church corporations before submission to the court.” (NY Dept of Law, Mem to Governor, Bill Jacket, L 1981, ch 244.)
Conversely, notice to the Attorney-General was deemed necessary for those corporations not specified in Religious Corporations Law § 2-b in order to afford members of those corporations the same types of safeguards against abuse in the transfer of real property transactions which are afforded to the hierarchical organizations who are required to obtain specific consents to transfer property.
*859 Pursuant to both the Free Exercise and Establishment Clauses, legislation that singles out a particular religious group for special benefits or burdens should be evaluated under a strict scrutiny test, requiring that the law be closely fitted to a compelling State interest (Grumet v Board of Educ., 81 NY2d 518, 532 [Kaye, Ch. J., concurring], affd 512 US —, 114 S Ct 2481).
Here, the State’s interests in protecting members of religious corporations — by safeguarding the potentially substantial proceeds from sales of property, and ensuring that the proceeds are properly disbursed — are compelling ones (see, Larson v Valente, 456 US 228, 248 ["the state of Minnesota has a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and that this interest retains importance when the solicitation is conducted by a religious organization”]).
The Attorney-General also argues that the statutory obligation challenged is narrowly tailored to meet its objectives. The Archdiocese claims that because it is a hierarchical church— and not exempted from giving notice to the Attorney-General —the statute is not closely fitted to the government’s compelling interest. It is argued that the statute does not exempt all hierarchical churches. Rather it favors specific hierarchical churches while leaving out others, such as the Archdiocese.
The proof submitted by the Archdiocese does not demonstrate as a matter of law that it is a hierarchical church— where the religious congregation is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judiciary over the whole membership of that general organization (Maryland & Va. Churches v Sharpsburg Church, 396 US 367, 369, n 1 [1969]). Nor has the Archdiocese demonstrated that the structure of its particular church ensures that its members will be protected from abuses in the transfer of real property which are afforded to the hierarchical organizations which are required by statute to obtain specific consents to transfer property.
Where, as here, the structure of a particular church does not assure that its members have an opportunity to review the sale of real property, the statute provides for notice to the Attorney-General of the petition in order to allow the Attorney-General to perform that role in a particular proceeding. *860 As such, the de minimis statutory obligation of notice to the Attorney-General is narrowly tailored to meet its objectives. Accordingly, it is declared that the statutory provisions requiring notice to the Attorney-General are constitutional pursuant to the Free Exercise and Establishment Clauses.
The Attorney-General’s motion for discovery is granted. The Attorney-General has demonstrated "ample need” for such discovery of, among other things, the circumstances surrounding the contract modifications (Antillean Holding Co. v Lindley, 76 Misc 2d 1044).